UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAULA McDANIELS,

    Plaintiff,

vs.                                                    Case No. 15-13136

PLYMOUTH-CANTON COMMUNITY          HON. AVERN COHN
SCHOOLS,

    Defendant.
_____/

## MEMORANDUM AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 18)

I. Introduction

This is an employment case. Plaintiff Paula McDaniels (McDaniels) is suing defendant Plymouth-Canton Community Schools (PCCS) contending that she suffered discrimination based on her gender under Title VII and Michigan's Elliot Larsen Civil Rights Act[1] when she was passed over for a promotion from an Assistant Head

---

[1] McDaniels also asserted a claim for retaliation under the Family Medical Leave Act (FMLA) based on her July 2012 FMLA leave and a statement appearing in her evaluation which referred to her "medical issues" but did not reference the FMLA. PCCS contends that the claim is time barred and lacks merit because the record shows that PCCS hired two individuals in the position she desired who had taken more FMLA leave. McDaniels' response addresses her FMLA claim in a single paragraph and fails to respond to PCCS's arguments. Under these circumstances, McDaniels' FMLA claim is DISMISSED. See McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." citation and internal quotations omitted).

Maintenance Custodian to Plant Engineer on three occasions.[2]

Before the Court is PCCS's motion for summary judgment on the grounds that there is no genuine issue of material fact that McDaniels' failure to be selected for the Plant Engineer positions was not due to her gender. For the reasons that follow, the motion will be granted.

## II. Background

The relevant facts as gleaned from the parties' papers follow:[3]

### A. Maintenance Positions at PCCS

The Maintenance Department at PCCS has three levels of maintenance employees: 1) Plant Engineers; 2) Assistant Head Maintenance Custodians (AHM); and; 3) Custodians. Plant Engineers are the highest-level employees in the Maintenance Department, followed by AHMs, then Custodians.

AHM Custodians are further divided into three groups: AHM-A, who work at the high school; AHM-B, who work at the middle school; and AHM-C, who work at the elementary school level. AHM-A's are considered the highest-level employees in this group because they work in a larger school building, and confront the largest number of maintenance issues. This hierarchy is reflected in AHM's collective bargaining

---

[2]McDaniels filed a charge of discrimination regarding only one of the three positions. While PCCS argues that McDaniels cannot challenge the other two positions under Title VII, it has addressed all the positions. Thus, the Court assumes, without deciding, that McDaniels' failure to be hired for any of the three positions is properly at issue.

[3]Neither party fully complied with the Court's motion practice guidelines for motions for summary judgment. Notably, neither party highlighted the relevant portions of their exhibits and PCCS did not separately tab its exhibits.

agreement (CBA). Under the CBA, AHM-As are paid more per hour than the other levels of AHMs.

The Plant Engineers, the position at issue, are "responsible for the operation, care and maintenance of the heating, ventilating, lighting and plumbing systems in the building." They are also required to "[s]upervise the care, maintenance and repairs of the building, equipment and grounds," and to "[c]heck that mechanical systems are operating properly." "It is [also] expected that a Plant Engineer, in addition to the supervisory and training duties, will also actively participate in the . . . maintenance operation of the building. . ." (PCCS Ex. 2 Plant Engineer Job Description).

As explained in the affidavit of Joe West (West), a Plant Engineer with PCCS since 1994 and a Union Representative for Plant Engineers, the duties include maintaining and repairing the building, equipment and grounds. To this end, Plant Engineers were required to perform tasks such as the following; stripping the wood gym floors, changing light ballasts, light switches and plugs; doing necessary maintenance to repair supply fan motors, including replacing wiring; changing Sloane valves and faucets; fixing plumbing leaks; repairing toilets, including changing flush valves, gaskets, and diaphragms; repairing and rewiring GFI outlets that extend downward from classroom ceilings; and repairing motors on small and mid-size equipment. (PCCS Ex. 5 Joe West affidavit).

The AHMs and Custodians were responsible for cleaning the buildings and assisting Plant Engineers with the above duties. (PCCS Ex. 3 AHM Job Description).

Each school building has one Plant Engineer, and a varying number of AHMs and Custodians. (PCCS Ex. 1 McDaniels' deposition at p. 34-35). There were

3

approximately 20 Plant Engineer positions and 70 custodial positions at PCCS. Id.

The Director of Maintenance for PCCS from 2004 until January 2014 was Harry Lau (Lau). Two females held Plant Engineer positions for PCCS under Harry Lau: Barb Bartel and June Rorabacher.

B. McDaniels' Employment with PCCS

McDaniels began her employment at PCCS in the Maintenance Department in 1997. She worked as an AHM-C at Hoben Elementary School (Hoben) starting in 2005. McDaniels' supervisor for the entire time she worked at Hoben was Plant Engineer Mike Hartline (Hartline). McDaniels and Hartline were close friends, and remain close friends today. (PCCS Ex. 1, McDaniels' deposition, at p. 42, 83). McDaniels admitted she had very limited experience and knowledge regarding mechanical, electrical, or plumbing systems. (PCCS Ex. 1 McDaniels' deposition at p. 13-15).

C. The Gallimore Elementary Plant Engineer Position

In March 2013, PCCS posted an opening for a Plant Engineer position at Gallimore Elementary School (Gallimore). When posting the Plant Engineer positions, consistent with the job description, the school district wanted to hire someone who had demonstrated experience dealing with mechanical, electrical, and plumbing issues. (Ex. 5 West affidavit). The school district gave preference to actual experience in these areas over attendance at instructional classes. (PCCS Ex. 5 West affidavit).

In early April 2013, McDaniels applied for the Plant Engineer opening at Gallimore. She was one of 23 total applicants for the position. After submitting her application, McDaniels was selected as one of six finalists for the position, along with two other female applicants, Kathy Ladenberger and Judy Spehar. These three

4

females were selected as finalists over twelve other male applicants for the position.

The finalists for the Gallimore position were required to take a test and participate in interviews with the hiring committee. The hiring committee consisted of Gallimore Principal Kimberly May, who is female, Maintenance Director Harry Lau (Lau), Plant Engineers Bruce Haarala, and Union Representative West.

After the first round of interviews were completed, on April 19, 2013, the hiring committee (including Kimberly May) unanimously agreed that Dan Wolff (Wolff) should receive the position.

According to West, Wolff received the position because the committee believed that he had a superior understanding of, and greater experience in, handling maintenance issues than McDaniels. (Ex. 5 West affidavit). As for his background, Wolff was originally hired by PCCS on March 26, 1996, approximately one year before McDaniels. Wolff had consistently received excellent evaluations since his hire. He was also identified by his supervisor as being "very bright and ready for a leadership role." (PCCS Ex. 9 Wolff Evaluation). Wolff had been an AHM-A at Canton High School since 2003, and therefore was a higher-level maintenance employee than McDaniels. And by virtue of working in a building more than three times larger than the elementary building where McDaniels worked, Wolff confronted more building issues on a daily basis, and, according to PCCS, received more relevant job training.

Moreover, Lau (who was on the committee) had prior experience with Wolff. During their time together, Lau testified at deposition that he had seen Wolff successfully complete many "preventative maintenance" projects:

I had actually witnessed Dan performing duties in all these, less the heavy

5

equipment. He had performed duties in plumbing, changing a P-trap, fixing a valve, carpentry. He would work in a door hardware. Electrical, may be changed a plug or a switch. HVAC, he would change filters, grease motors, do things in the boiler room. He was curious and asked questions and he stuck to people that were doing these things and he learned it.

(PCCS Ex. 10 Lau deposition at p. 40). Lau further testified that he encouraged Wolff to apply for the open position at Gallimore. (PCCS Ex. 10 Lau deposition at p. 43).

In contrast to Wolff, Lau testified that McDaniels had not demonstrated the same skill set to Lau. (Ex. 10 Lau deposition at p. 41, 72). Lau testified as follows:

> Q. Do you have reason to believe that Paula was not performing any of those functions that you just listed for Dan?
> A. Yes. I had not witnessed her perform these duties, and as a matter of fact, she would lean on her plant engineer to perform them, even in an instance where she would perform their jobs for any amount of time, whether it be a day or a week, she would leave notes for Mike that certain things needed to be completed. (Ex. 10 Lau p. 41).
> A. I'm suggesting that she would not do tasks and leave it for another employee while she was performing that job.
> Q. What tasks do you specifically recall her leaving for another employee?
> A. Ballast, for sure, changing ballast.
> Q. Anything else?
> A. In an electrical end mainly. I recall some plumbing issues that she had to call to central maintenance and have a plumber come down and help her with.

(PCCS Ex. 10 Lau deposition at p. 72).

When comparing McDaniels' and Wolff's demonstrated skills, Lau believed that Wolff was more qualified:

> I know that she didn't practice a lot of the preventative maintenance issues. She left that to Mike Hartline, Plant engineer. And Dan actually was engaged in performing these PM's on the HVAC, on motors, on different mechanical systems, repairing custodial equipment, vacuum cleaners, what vacuums in these types of things. So he was more confident in the day-to-day actually using tools and fixing things.

(Id. at p. 38).

McDaniels agreed that she did not have much practical experience in these

6

areas, and further admitted that her knowledge of these areas was limited. (PCCS Ex. 1 McDaniels's deposition at p. 13-15). McDaniels testified she had "very little" experience with plumbing, Id. at p.13, and even "less" experience with electrical work. Id. at 14.

West, who was on the committee, also did not believe McDaniels was the best qualified for the Plant Engineer position. West had supervised McDaniels in the past. According to his affidavit, when they worked together, McDaniels submitted work orders to central maintenance to address issues she should have completed, such as handle lunch trash. McDaniels also never performed any of the "maintenance" work in the building, and instead left most of that type of work for West.

Lau also testified that during the interviews, Wolff effectively communicated to the panel that he understood how to address preventative maintenance issues. Lau further explained that McDaniels, conversely, did not demonstrate the ability to perform this type of work while on the job, and did not appear confident answering questions regarding mechanical, electrical, or plumbing systems during the interview.

As to why Wolff was hired over McDaniels, McDaniels testified that she believed Wolff was selected for the position because Lau already knew that he wanted Wolff for the position before interviews took place. (PCCS Ex. 1 McDaniels's deposition at p. 47-48). Thus, McDaniels testified that because Lau already knew who he wanted, no other candidates—male or female—were given consideration for the position. (Id. at p. 59).

McDaniels further testified that another male candidate, Jeff Maloney, was the most likely to receive the Gallimore position. (PCCS Ex. 1 McDaniels's deposition at p.

7

57-58, 62). McDaniels testified that Maloney had more qualifications for the position than she did. Maloney had been an AHM-B at the middle school, which was a higher level than what McDaniels held. And unlike McDaniels, Maloney had completed all of the maintenance sessions. See PCCS Ex. 1 McDaniels's deposition at p. 58: "[Maloney] was the middle school assistant head maintenance, been there a few years, had all of his classes."). McDaniels further testified that Jeff Maloney was not chosen for the position for the same reason she was not chosen, i.e. Wolff's close relationship with Lau:

> Q: Well, other than that, do you know the specific reason why Jeff wasn't chosen? A: Probably the same reason I wasn't.

(PCCS Ex. 1 McDaniels's deposition at p. 58). McDaniels also testified that she did not believe gender played a role in denying Maloney the position. Id. at p. 70.

### D. Hulsing Elementary Plant Engineer Position

In September 2013, a Plant Engineer position opened at Hulsing Elementary School (Hulsing). McDaniels applied for the Hulsing position. She was one of fifteen total applicants for the job; eleven males and four females. (PCCS Ex. 12 Hulsing Interview List). The hiring process for the Hulsing position was similar to the process for the Gallimore position. After submitting applications, the hiring committee selected five finalists for the position. The finalists were then required to complete a written examination and participate in in-person interviews.

The hiring committee for the opening at Hulsing Elementary consisted of Lau, Hulsing Principal James Johnson (Johnson), and Plant Engineer Union Representatives Kevin Jantovsky and West. Principal Johnson was on the hiring committee because the

8

Plant Engineer would work in his building, and therefore, he wanted a say as to who would be Plant Engineer. McDaniels was selected as one of two finalists for the position, along with Derek Leright (Leright). The two finalists then completed interviews. The interviews were conducted by Lau, Bruce Haarala, and Johnson. Derek Leright was chosen to be the Plant Engineer at Hulsing.

Leright had been working for the past year as an AHM at Hulsing when the position was posted. As a result, Leright was familiar with the Hulsing building, and knew the Hulsing administration and staff well—including the principal, Johnson. Indeed, Johnson testified about his relationship with Leright while he worked as an AHM at Hulsing before the posting:

> I knew Mr. Leright well before the position opened in September 2013 because Mr. Leright had worked in my building as an AHM the previous school year under Scott Reid. While Mr. Leright worked as an AHM, I got to know him well, and thought that he was a great person. Mr. Leright got along well with everyone in our building. While he was an AHM at Hulsing, Mr. Leright constantly asked staff member, "what can I do to help you?" I really appreciated his attitude. I also thought Mr. Leright did a great job as an AHM.

(PCCS Ex. 13, Johnson's affidavit).

Johnson also stated that he had witnessed Leright complete multiple maintenance projects at Hulsing:

> During the course of his duties as an AHM, Mr. Leright demonstrated he had advanced skills in plumbing, electrical, and heating/ventilation/air-conditioning (HVAC). On multiple occasions while he was an AHM, Mr. Leright spotted plumbing, electrical and HVAC issues, and fixed those issues. This eliminated the need to pay for skilled tradesmen to address these issues on multiple occasions. This was a significant benefit to the school district, especially because the school district was facing a budget deficit and trying to cut costs. For example, I can recall Mr. Leright replacing a number of light ballasts, replacing multiple light switches in various locations, making repairs to plumbing connections, and multiple repairs to the HVAC units located on the roof."

(Id.).

Johnson also explained that he received a recommendation for Leright from Scott Reid, the former Plant Engineer Leright worked under at Hulsing. Id.

West also stated that he was familiar with Leright in another building, and agreed with Principal Johnson's assessment of Leright's skills. (PCCS Ex. 5 West affidavit).

As to why she was not selected for the position, McDaniels testified that although she believed that Leright was qualified for the position and it would be appropriate for the building principal to want Leright to continue in the building as the Plant Engineer because of his familiarity, the hiring decision was based on gender discrimination because Leright is male and she is female. (PCCS Ex 1 McDaniels's deposition at p. 102).

### E. Budget Cuts at PCCS and McDaniels Leaves PCCS

In approximately 2010, to correct a multimillion dollar budget deficit, PCCS maintenance employees' and teachers' health benefits were eliminated. Also, the maintenance staff was reduced from 90 employees to 70. During the 2013-2014 school year, PCCS learned it once again faced a significant budget deficit. On June 10, 2014, PCCS instituted multiple budget reductions, including laying-off 44 teachers and privatizing the Assistant Head Maintenance and custodial employees. See PCCS Ex. 16 June 10, 2014 school board meeting minutes.

As a result of the privatization, all 70 AHM and custodial employees received layoff notices in June 2014. Following the layoffs, PCCS contracted with Grand Rapids Building Services (GRBS) to provide maintenance services for the District. All 70 AHMs and Custodians were offered an opportunity to continue working at PCCS in their same

position, but as employees of GRBS. GRBS offered all 70 AHMs and Custodians a raise in their hourly wage over what they were paid by PCCS to continue working at PCCS. Nearly all of the affected individuals accepted the offer.

McDaniels, however, did not accept the offer. Her employment ended with PCCS on June 18, 2014. (Ex. 1 Pl. p. 110).

### F. Events After McDaniels Leave PCCS

#### 1. Workman Elementary Position

At about the time McDaniels ended her employment in June of 2014, PCCS posted an opening for a Plant Engineer position at Workman Elementary school. When this position was posted, Director Lau was no longer at PCCS. Richard Peterson was the new Director of Maintenance and Operations. The hiring committee for this posting consisted of Human Resources Director Kurt Tszykiewicz, West, and Bruce Haarla. McDaniels did not apply for the position.

Following the interview process, the hiring committee selected Michael Oakes, Sr. (Oakes) for the position. Oakes was hired by the district as a custodian in 2009. Since his hire, Oakes worked in multiple buildings, including Central Maintenance. (Ex. 20 Tyszkiewicz Affidavit; Ex. 18 Oakes, Sr., Application). McDaniels admitted at deposition that Oakes was qualified to be the Plant Engineer at Workman Elementary. (PCCS Ex. 1 McDaniels's deposition at p. 111-112).

#### 2. PCCS Hiring and Elimination of Plant Engineer Positions

Shortly after McDaniels left PCCS, PCCS posted an opening for a Plant Engineer position at Allen Elementary School. Katherine Ladenberger, a female, received the position.

11

Thereafter, in 2015, all of the Plant Engineer positions McDaniels challenges were eliminated as part of a budget cut. Accordingly, Wolff, Leright, Oakes, and Ladenberger are no longer Plant Engineers at PCCS.

### III. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Rule 56 provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). In so doing, the Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).

IV. Analysis

A. Legal Standard for Gender Discrimination

Because McDaniels does not have direct evidence that she was denied the Plant Engineer positions because of her gender, she must proceed under the burden-shifting framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to analyze her claims.[4] Hopson v DaimlerChrysler Corp., 306 F.3d 427 (2002). McDaniels must first make out a prima facie case of discrimination in failing to hire by showing that: "(1) she was a member of a protected class; (2) she applied for and was qualified for the position ...; (3) she was considered for and denied the position; and (4) she was rejected in favor of another person with similar qualifications who was not a member of [the] protected class." Mayhue v. Cherry St. Services, Inc., 598 F. App'x 392, 403 (6th Cir. 2015)(quoting Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1095 (6th Cir.1996) (citation omitted)). If McDaniels succeeds in establishing a prima facie case, the burden then shifts to PCCS to articulate a legitimate, non-discriminatory rationale for the adverse employment action. Id. If PCCS does so, the burden shifts back to McDaniels to demonstrate that the articulated reason is a mere pretext for discrimination. Id.

B. Prima Facie Case

PCCS says that McDaniels cannot meet the fourth element of a prima facie case, i.e. that "she was rejected in favor of another person with similar qualifications who was not a member of [the] protected class." Mayhue, 598 F. App'x at 403. PCCS says that

---

[4] McDaniels' claims under Title VII and Elliot Larsen are subject to the same analysis. Sutherland v. Michigan Dept. of Treasury, 344 F.3d 603, 614 (6th Cir. 2003).

13

it wanted to hire someone who had experience dealing with mechanical, electrical, and plumbing issues to reduce its reliance on expensive outsourcing. PCCS says that the three candidates who were chosen for the position had a demonstrated ability in these areas and McDaniels admittedly did not have that experience or skill.

PCCS's argument that the three males chosen for the Plant Engineer positions had more experience than McDaniels goes more to whether McDaniels can show a pretext for gender discrimination than whether she has made out a prima facie case. Rather, there appears no dispute that McDaniels was qualified for the Plant Engineer position. Indeed, she was a finalist for the position on two occasions. There is also no dispute that McDaniels and her two male counterparts, Wolff, Leright, and Oakes had similar qualifications. PCCS's defense is that those selected had qualifications that made them more suitable candidates for the Plant Engineer position. It is those qualifications that play into whether PCCS's decision was a prextext for gender discrimination. Thus, the Court finds McDaniels has made out a prima facie case for gender discrimination.

### C. Legitimate Non-Discriminatory Reason

PCCS's burden of production of a legitimate non-discriminatory reason for not promoting McDaniels requires that it "articulate some legitimate, nondiscriminatory reason for the employee's rejection." Furnco Constr. Corp. v. Waters, 438 U.S. 567 (1978). The articulation requirement does not mean that the employer must prove the absence of a discriminatory motive. Bd. of Trs. of Keene State Coll. v Sweeney, 439 U.S. 24 (1978).

Here, PCCS says that it chose candidates who had demonstrated an ability to

address preventative maintenance issues which are part of the Plant Engineer position. PCCS also says McDaniels admitted she was not as experienced in these areas as the candidates who were chosen. These articulate reasons are non-discriminatory. Thus, PCCS has met its burden.

D. Pretext

McDaniels may establish pretext by showing that (a) the stated reasons had no basis in fact; (b) the stated reasons were not the actual reasons; or (c) that the stated reasons were insufficient to explain the defendant's action. Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir.1 994) (overruled on other grounds, Geiger v. Tower Automotive, 579 F.3d 614 (6th Cir. 2009)). The third prong "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." Manzer, 29 F.3d at 1084. It is McDaniels' burden to establish that similarly situated employees were treated differently than McDaniels under this part of the pretext test. Macy v. Hopkins Cty. Sch. Bd. of Educ., 484 F.3d 357 (6th Cir. 2006).

The Sixth Circuit has found that an employer's business judgment should not be questioned as a means of establishing pretext because the issue is not whether the decision was wrong or mistaken, but whether the decision was discriminatory. Hartsel v. Keys, 87 F.3d 795, 801 (6th Cir. 1996), cert denied, 519 U.S. 1055 (1997). Courts should instead defer to sound business judgment to avoid "the illegitimate role of acting as a 'super personnel department,' overseeing and second guessing employers' business decisions." Bender v. Hecht's Dep't Stores, 455 F.3d 612, 628 (6th Cir. 2006);

see also Skelton v. Sara Lee Corp., 249 F. App'x 450, 460–61 (6th Cir. 2007) (although plaintiff proffered evidence that the retained employees were less qualified, he "proffers no evidence that the retained [employees] were deficient with regard to Defendant's asserted non-discriminatory reason for the employees' termination."). As to an employer's business judgment in the context of hiring decisions, the Sixth Circuit has recognized "that employers are generally 'free to choose among qualified candidates,' Wren v. Gould, 808 F.2d 493, 502 (6th Cir. 1987), and that '[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with,' Hartsel, 87 F.3d at 801." Bender, 455 F.3d at 626.

The crux of this case lies in whether McDaniels has established pretext sufficient to survive summary judgment. PCCS says McDaniels has not shown that it did not really prefer candidates who had a demonstrated ability to perform plumbing, mechanical, and electrical work, which PCCS refers to as "preventative maintenance." McDaniels contends that the ability to perform "preventative maintenance" is not part of the job description of a Plant Engineer.

PCCS has the better view. The job description for Plant Engineer states that they are "[r]esponsible for the operation, care, and maintenance of the heating, ventilating, lighting and plumbing, and electrical systems in the building." (PCCS Ex. 2, Doc. 18-3, Job Description). McDaniels makes too much out of PCCS' use of the phrase "preventative maintenance." While admittedly the phrase does not appear in the job description, it is clear that Plant Engineers are responsible for maintaining the building systems, which necessarily includes being knowledgeable about and experienced in working on those systems. "Preventative maintenance" is simply

16

another way to describe the ability to operate, care for, and maintain the several building systems. It is not, as McDaniels contends, an unstated job requirement.

McDaniels admits that the males chosen for the Plant Engineer positions were qualified but says she was better qualified because in approximately 1999, 14 years before the first posting, McDaniels attended informational sessions in plumbing, carpentry, woodwork, and electrical. She notes that Wolff did not attend any training session. Each session lasted approximately a half day, so McDaniels attended a total of approximately two days in sessions. Also in approximately 2009, she completed most of an at-home course in heating, ventilation, and air-conditioning (HVAC). The at-home course required McDaniels to read a 400-page book and take a series of at-home tests at her leisure. (Ex. 1). Despite this training, McDaniels admitted that her practical experience and knowledge of these areas was limited. (PCCS Ex. 1 McDaniels's Deposition at p. 13-15, "very little" plumbing experience, even "less" electrical). Training aside, Lau and West also testified that PCCS valued actual experience performing maintenance projects over attending these classes. (Ex. 5 West affidavit). Thus, McDaniels' training does not necessarily make her a better candidate than those who were selected.

McDaniels says that when making its hiring decisions, PCCS placed greater emphasis on actual experience in certain areas such as plumbing, electric, and woodworking, over attending brief training sessions. This argument is not evidence of pretext as a matter of law.

When making a hiring a decision, an employer may give greater weight to certain qualifications or experiences over others. In <u>Browning v. Dep't of the Army</u>, 436 F.3d

17

692 (6th Cir. 2006), the Sixth Circuit found that it is not evidence of discriminatory pretext for an employer to place subjective emphasis on specific qualifications not listed in the job posting. The court also found that it is not evidence of discriminatory pretext for an employer to consider attributes other than those stated in the strict language of a job description when making a hiring decision:

> [T]his court has held that employers are not rigidly bound by the language in a job description. Wrenn v. Gould, 808 F.2d 493 (6th Cir. 1987). As explained in Wrenn, employment-discrimination laws do "not diminish lawful traditional management prerogatives in choosing among qualified candidates," . . . Id. at 502 (holding that an employer can consider factors external to a job description when selecting among qualified candidates) (citation and quotation marks omitted).

Id. at 696-697. See also Cline v. BWXT Y-12, LLC, 521 F.3d 507 (6th Cir. 2008) ("That the job description itself did not express an interest in college program candidates does not prevent the company from including such candidates in its mix of interviewees."); Young v. Oakland County, 176 F. App'x 644 (6th Cir. 2006).

Here, as an employer exercising its business judgment, PCCS placed greater emphasis on actual hands-on experience in completing projects over attending limited training sessions. McDaniels has not introduced any evidence that Plant Engineers do not perform that type of work regularly. It is not evidence of pretext that PCCS prefers to hire candidates who had shown an ability to perform that work.

Rather, a review of the record shows that the candidates who were selected were those that not only had hands-on experience but were familiar with the building and key personnel at the building where the position was open. In other words, the positions were filled based on familarity, even favoritism. A decision based on favoritism does not equate to a pretext for discrimination. Indeed, McDaniels said that

18

the reason she believed she did not receive the Plant Engineer position at Gallimore was because Lau already knew he wanted Wolff for the position based on his personal relationship with the candidates. McDaniels also said that Jeff Maloney was the biggest threat to receive the first Plant Engineer position because he was more qualified than she was. McDaniels testified that Maloney was not selected for the position for the same reason she was not, and admitted that it was not due to gender discrimination.

Courts have uniformly recognized that, "as a matter of law, a supervisor's favoritism towards someone based on their personal relationship, even if the relationship consists of a romantic affair, 'is not sex-based discrimination, as the favoritism, while unfair, disadvantages both sexes alike for reasons other than gender.... [S]uch 'paramour favoritism' is not an unlawful employment practice under Title VII....' " Rowe v. Jewell, 88 F.Supp.3d 647, 666 (E.D. La. 2015) (citing Wilson v. Delta State Univ., 143 F. App'x 611, 613–14 (5th Cir. 2005) (quotation omitted)). See also Briggs v. Univ. of Detroit-Mercy, 22 F. Supp. 3d 798, 809-10 (E.D. Mich. 2014) (explaining that "when a supervisor gives favorable treatment to her paramour, every other employee 'with whom she is not having sex' experiences the resultant discrimination or harassment, regardless of their gender." ) citing Sherk v. Adesa Atlanta, LLC, 432 F. Supp. 2d 1358, 1371 (N.D. Ga. 2006)).

In light of the above, it was not discriminatory for Lau to prefer Wolff because he knew Wolff well. Nor was it discriminatory for Principal Johnson to want Leright to continue working at Hulsing because he was familiar with Leright and his work. Lau and Johnson did not have that same familiarity with McDaniels. To the extent Wolff and Leright were given "preference" and hired over both males and females, it does not

19

show pretext for gender discrimination.

Even if PCCS were somehow mistaken about the qualifications of the candidates, that is not evidence of pretext. "Under the 'honest belief' rule 'as long as an employer holds an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.'" Todd v. RBS Citizens, N.A., 483 F. App'x 76, 83 (6th Cir. 2012). See also Chen v. Dow Chem. Co., 580 F.3d 394, 401 (6th Cir. 2009) ("When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless.").

Here, McDaniels has not shown a genuine issue of material fact that PCCS honestly believed that Wolff, Leright, and Oakes all had greater maintenance skills than McDaniels. Also, McDaniels has not established a genuine issue of material fact over whether the selection of Wolff, Leright, or Oakes amounted to a prextext for gender discrimination.

V. Conclusion

For the reasons stated above, PCCS's motion for summary judgment is GRANTED. This case is DISMISSED.

SO ORDERED.

S/Avern Cohn<br>
AVERN COHN<br>
UNITED STATES DISTRICT JUDGE

Dated: 10/18/2017
    Detroit, Michigan